CHARLES G. GOLDSMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goldsmith v. Commissioner
Docket No. 20787-83.
United States Tax Court
T.C. Memo 1986-227; 1986 Tax Ct. Memo LEXIS 379; 51 T.C.M. (CCH) 1128; T.C.M. (RIA) 86227; June 5, 1986. *379 Held: Petitioner did not own more than 50 percent in value of the stock of a foreign corporation and, therefore, was not taxable on its income under section 551 et seq.Held further, petitioner did not divert to his own account $178,000 of income of a corporation of which he was chief executive officer. William A. Carey, for the petitioner. Sharon C. Armuelles, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the calendar years 1975 and 1977 in the amounts of $1,052,741 and $86,544, respectively. All issues for the year 1977 having been settled between the parties, we must determine whether or not petitioner is taxable for the year 1975 on $1,384,407 of foreign personal holding company income and whether petitioner omitted an additional $178,000 of taxable income from his 1975 Federal income tax return. Explanation of Issues
The issues in this case arose during petitioner's tenure as Chief Executive Officer (CEO) of Intercontinental Diversified Corp. (ICD), a Panamanian corporation formed in 1970. More precisely, it is respondent's contention that Zodiac Shareholdings, *380 Inc. (Zodiac), also a Panamanian corporation and the successor by change of name to Groves Development Co. Inc. (Development Co.) was, during the year 1975, wholly owned by petitioner individually and for his own benefit, making it a foreign personal holding company under section 552. [1] Respondent further contends that in 1975 petitioner caused ICD to purchase from Zodiac shares of The Grand Bahama Development Company, Limited (Devco), a Bahamian corporation, for a grossly inflated price. The alleged gain on this transaction is the principal element of the foreign personal holding company income. The omitted income of $178,000 is comprised of three items: $94,000 transferred from ICD to Castle Bank & Trust Limited (Castle), a bank based in Nassau, Bahamas; $75,000, also transferred from ICD to Castle and thereafter to Zodiac; and, $9,000 of ICD funds transferred to petitioner. FINDINGS OF FACT Some of the facts have been stipulated and they are so found. At the time the petition in this case was filed, petitioner was a resident of Palm Beach, Florida. Background Information *381 In 1955, Wallace Groves (Groves) caused The Grand Bahama Port Authority, Limited (Port), a Bahamian corporation, to be organized to construct a deep water harbor and to develop land primarily for industrial purposes, in the area of Freeport on Grand Bahama Island pursuant to an agreement with the Bahamian Government, authorized by an Act of the Governor, the Legislative Counsel, and the Assembly of the Bahama Islands. Fifty percent of the stock of Port was owned indirectly by Groves' wife, [2] *382 25 percent by Sir Charles Hayward (Sir Charles) of London, England, and the remainder by a group of investors. Groves was CEO and Sir Charles was Chairman of the Board of Port. Petitioner, during the period 1958 through 1968, was a director of Port and President of a subsidiary of Port. Devco was organized in 1961 as a 50-percent owned subsidiary of Port to promote residential development in the Freeport area. In 1968 92.5 percent of the outstanding stock of Port was acquired by Benquet Consolidated, Inc. (Benquet), a Philippine corporation, in exchange for shares of Benquet stock. The remaining 7.5 percent was owned by the Bahamian Government. Groves continued as CEO of Port. Conflict developed between Groves and the Hayward family, including Jack A. Hayward (Hayward), the son of Sir Charles. As a result of irregularities committed by Groves in 1970, he was forced to resign as CEO and Director of Port, but he installed in his place a management team selected by him. Again controversy developed between the Hayward interests and Groves. Edward St. George (St. George), an English barrister and formerly Chief Magistrate and thereafter Solicitor General of the Bahamas, was the legal advisor to the Hayward Family and was involved in their running battle with Groves. When the new management was ousted, St. George was instrumental in selecting petitioner as the compromise CEO for ICD, effective in January 1972. [3]
In the meantime, a plan of reorganization of Benquet had been developed pursuant *383 to which all of its assets located outside of the Philippines, principally the common stock of Port, were to be transferred to ICD with the shares of ICD then to be exchanged share-for-share for shares of Benquet so that such of the shareholders of Benquet as wished to do so could become shareholders of ICD rather than Benquet. In effect this resulted in creation of two publicly held corporations, one holding Philippine assets and the other non-Philippine assets. The purpose of the reorganization was to allow shares of Benquet and ICD to be exchanged so that 60 percent or more of Benquet's share ownership would end up in the hands of Philippine citizens. It was expected that the Groves-Hayward interests would own the controlling interest in ICD. This plan was consummated in 1974 at which time ICD became operational. Groves, through Mrs. Groves, became the largest shareholder of ICD with approximately 34 percent of its outstanding stock. Sir Charles was the second largest shareholder. A significant factor contributing to the continuing and bitter controversy between Groves and the Hayward family (and their counselor St. George) was the prediliction of Groves to run Port and its *384 subsidiaries autocratically. As the controlling shareholder he apparently felt little responsibility to Sir Charles, the largest minority shareholder. The acquisition by Benquet appears to have had little impact on Groves' control and management of Port. However, the Haywards and St. George expected that petitioner would serve the interests of all shareholders and would in effect exclude Groves from any substantial influence on future management of ICD. This did not, in fact, happen, but acting in reliance on their understandings with petitioner the Haywards and St. George paid little attention to the operations of ICD from 1972 until late in 1975. 1972 through 1975
During the period 1972 through 1975, from the standpoint of the Hayward interest, petitioner had the authority to and was in fact expected to be managing ICD in his discretion. However, Groves continued to occupy the CEO's suite in what had been Port's office and became the ICD headquarters. Petitioner occupied the office adjacent to the CEO suite, allocated to the President of ICD. Contrary to his understanding with St. George and the Haywards, petitioner consulted constantly with Groves and especially during the *385 first part of this period, left much of management to the remaining officers, spending much time in New York City attending to his other business activities. Consequently the other officers were free to consult frequently with Groves. During this entire period, not major business action was carried out by ICD without Groves' knowledge and approval (implicit or explicit). A constant business consideration at this time was the need to maintain friendly relations with the then government of the Bahamas, the Progressive Liberal Party (PLP), as well as the minority Free National Movement Party (FNM). The latter had been in control of the Government and, at least in 1972 and 1973, was actively trying to return to control. Contributions to political parties are legal in the Bahamas [4] and ICD and its predecessors for many years made a practice of contributing to the FNM Party, both while it was the governing party and after its ouster by the PLP. Petitioner was aware of the ICD's policy of making political contributions and was also aware that the amount of such contributions and the person or party to which made needed to be kept confidential. This was difficult since a representative *386 of the Government was a director of ICD. Petitioner considered that he was "the point man" for political activity in the Bahamas on behalf of ICD and its subsidiaries, an important activity in view of the election anticipated during 1973. Accordingly, petitioner in consultation with Groves concluded that a slush fund should be set up in an off-the-books bank account to be used for political contributions. A some point, although whether before or after 1972 is unclear, a procedure *387 had been initiated by Port or ICD and the subsidiaries for securing cash for political contribution purposes without reflecting that use on ICD's books. The procedure involved having suppliers submit false invoices for services. On payment of the invoices the suppliers would remit the funds back to ICD or as it directed. This procedure appears to have been suggested by Miami, Florida counsel for ICD, a former member of which, Mary Jane Melrose, was serving as Vice President, General Counsel, and Director of ICD. The officers of ICD, including Donald C. de la Rue, Vice President-Finance and, of course, petitioner, were involved in this procedure, which was also known to Groves, Hayward, and St. George. Among others, St. George and his Freeport office assisted by submitting false invoices as did other respected Bahamian counsel. Since there was no income tax in the Bahamas, this practice did not affect adversely obligations owed to the Bahamian Government and appears to have been viewed as both legal and ethical. [5] *388 In addition to this practice, from time to time ICD cash was physically transported from the United States to the Bahamas without reporting the facts to the appropriate agency of the United States in violation of U.S. currency laws. At least some of this cash was delivered to petitioner. Groves, with the assistance of Thomas Rozak, [6] made available to petitioner an inactive Pamanamian company, Development Co., as the vehicle for the holding of ICD funds in an off-the-books bank account. The officers and Board of Directors of Development Co. were Groves, Mrs. Groves, and Rozak. The stock of Development Co. was in the form of "bearer" shares, possession of which reflected ownership. According to the minutes of Development Co., Mrs. Groves was the possessor of the bearer shares which reflected Groves' practice and was consistent with the holding of stockholder and director meetings at the Groves' residence. In any event, the shares were subject to *389 the control of Groves. Development Co. maintained its bank account in the Royal Bank of Canada in Montreal (Royal Bank), the same bank in which ICD maintained its principal bank account. Until the early part of 1975, the sole signatories on the bank account were the two Groves and Rozak. Groves had requested that Development Co.'s name be changed and, effective on August 21, 1973, the name became Zodiac Shareholdings, Inc. (Zodiac). In April 1975, Rozak resigned as Director and Secretary/Treasurer of Zodiac and Peter Aston, an individual then acting as bookkeeper for petitioner, was appointed Director and Secretary/Treasurer and also became a signatory on the bank account. Petitioner never had signature authority over any bank account of Development Co. or its successor Zodiac. At least through April 15, 1975, Mrs. Groves continued as the holder and therefore the legal owner of the bearer shares. There is no evidence of the holding of shareholder or director meetings subsequent to April 15, 1975. [7] *390 At a point in time unknown an effort was made to reissue the Development Co. bearer shares in Zodiac's name. The certificate appears to have been filled out but it was not signed by the officers--Groves or Mrs. Groves and Rozak or Aston--at least until after petitioner's resignation as CEO of ICD in February 1976. There is no evidence as to the ultimate disposition of the Development Co. share certificates held by Mrs. Groves. During the period April 15, 1975, until after petitioner's resignation, the physical location of the Development Co. certificates is unclear. [8] *391 In early 1972, ICD initiated a program to purchase the minority interests outstanding in Devco. This program continued until all of the shares not owned by ICD, including those of petitioner, had been acquired. In May 1973, with the knowledge and approval of Groves, petitioner made a written offer to Development Co. to sell it petitioner's shares of Devco stock for an aggregate price of $650,000 or $3.25 per share. The terms of the offer called for an installment sale with the initial payment of *392 $125,000 being due immediately and the balance to be paid in five equal yearly installments of $105,000 each with interest. It was at the time intended both by petitioner and by Groves that ICD would ultimately become the owner of petitioner's Devco stock and ICD funds were used to pay the purchase price. A Nassau attorney, Geoffrey Johnstone, was designated as escrow agent to hold the shares of Devco stock pending payment in full of purchase price. The first installment was paid on May 23, 1973, with a check payable to petitioner drawn by Development Co. on its Royal Bank account. This check was signed by Groves and Rozak. Funds for this purpose were derived from $117,000 paid by ICD to Johnstone and deposited to the Development Co.'s bank account at petitioner's direction. The sum of $33,000 was also deposited in that bank account. On ICD's books the $117,000 was recorded as an expenditure for the purchase of Devco stock. Another deposit was made in August 1973 to the Development Co. account by Johnstone using ICD funds. Petitioner reported gain on the installment sale of his Devco stock on his 1973 Federal income tax return. During this 1972-1976 period, using the false invoice *393 procedure, substantial ICD funds were transferred to the Development Co.-Zodiac bank account. Funds so deposited were, by and large, invested and reinvested in certificates of deposit issued by the Royal Bank to the extent not expended. Similarly, funds were transferred to Castle in this indirect route. [9] In June 1974, Zodiac issued its check, signed by Rozak, in the amount of $575,875 to petitioner representing the balance due on the installment sale of Devco stock plus accrued interest. The use of fictitious invoices to generate political contribution funds on an ad hoc basis was found to be a cumbersome method. It also required that the monies disbursed be treated as expenses for financial accounting purposes. It was recognized that if funds could be generated through *394 the purchase of an investment asset the expenditure would be recorded in ICD's investment account, thus having no adverse affect on net earnings. By September 1975, the only outstanding Devco stock not owned by ICD was the block of shares formerly owned by petitioner which had been paid for by Development Co.-Zodiac using ICD funds but which may still have been held in the name of Johnstone as nominee. Petitioner, with Groves knowledge and approval, [10] *395 caused ICD to purchase this stock for $10 a share, far in excess of the average per share cost of the minority shares acquired by ICD and, of course, substantially in excess of the $650,000 paid to petitioner for his stock. Two million dollars in ICD funds was channeled through Johnstone to Zodiac in payment of the purchase price, reflecting an apparent book profit to Zodiac of $1,350,000. Payment to Zodiac was handled by de la Rue. It is this book profit, together with some $35,000 of interest earned by Zodiac, which respondent has determined to be foreign personal holding company income taxable to petitioner in the year 1975. By the end of 1975, Zodiac had on hand almost $3,000,000. [11]
January - February 1976
St. George returned to the Bahamas in December 1975 for personal reasons. Various bits and pieces of information which came to him somewhat haphazardly made him suspicious that there may have been an improper diversion of ICD funds which ostensively had been intended for political contributions. In a discussion with Johnstone, St. George became convinced *396 that a large sum of money, which he estimated to approximate $3,000,000, had been diverted by petitioner to Zodiac and accumulated instead of being immediately used for political contribution purposes and/or to acquire Devco stock. Hayward immediately came to Freeport at St. George's request to participate in the resolution of this problem. St. George discussed this matter both with Groves and with petitioner. [12] St. George and Hayward initially suspected that the funds in Zodiac represented another effort by Groves at misappropriation with the assistance of petitioner, but accepted Groves' disclaimer of knowledge of the diversion of ICD funds. When petitioner was confronted by St. George in early February, petitioner admitted that approximately $3,000,000 of ICD funds had been deposited in the Zodiac bank account. Without permitting petitioner to make a full explanation, St. George insisted that all Zodiac documents should be turned over to him and the funds returned to ICD control. St. George represented to petitioner that, if St. George obtained the Zodiac books and records and Zodiac funds in the amount of $3,000,000 and if petitioner resigned, he and Hayward would take no *397 action against petitioner, although he was then convinced that petitioner had intended to misappropriate these ICD funds. By February 19, 1976, St. George's demands were met. In the meantime, Groves undertook to persuade petitioner to document for Groves' benefit that Groves had had no knowledge of the transfer of ICD funds into Zodiac account and that Zodiac had been owned and controlled by petitioner since 1973. Accordingly, several documents were prepared and exchanged between petitioner and Groves during February 1976 (the February Documents), several of which were back dated to 1973. Rozak was an active participant in his capacity as Groves' assistant in the drafting and exchange of these Groves-petitioner documents. Discussing them in the order of their purported dates, a note handwritten by petitioner and dated April 1, 1973, was given to Groves. In this note petitioner purported to request that Mr. and Mrs. Groves transfer to him the shares, sharebook, and corporate papers of Development Co. Petitioner acknowledged in the note that the name "Groves" would *398 be eliminated from the corporate name and that the resignations of both Groves and Rozak as officers and directors would be acknowledged and accepted. [13] The language of the note was prepared by Groves and/or Rozak and presented to petitioner by one or the other of those individuals. The next of the backdated February Documents dated May 15, 1973 purports to reflect an agreement between Mrs. Groves and petitioner "as agent" for the sale by Mrs. Groves of the Development Co. stock with an acknowledgment of the transfer to petitioner of the share *399 certificate, the corporate seal, and corporate records. Petitioner's signature purports to have been witnessed by Groves. A document dated February 18, 1976, and apparently delivered to petitioner on or about that date, from the two Groves make formal demand for acceptance of their resignations as officers and directors of Zodiac. This document purports to recite that the alleged acquisition of the stock of Development Co. by petitioner took place in March or April 1973. The document also reflects the fact, which Groves could not deny, that Groves participated in the installment sale of petitioner's Devco stock to Development Co. Petitioner made one handwritten change in the text reflecting his insistence in February 1976 that ownership of the Zodiac stock was acquired in a fiduciary capacity as an agent for an undisclosed principal. Petitioner also endorsed on the document a statement that there were "other transactions in the company" but that the facts that were recited were correct. These February Documents are simply incorrect to the extent that they purport to reflect an actual purchase in 1973 by petitioner for his own account of the Development Co. stock and a delivery *400 to petitioner of the share certificates. Creation of these documents was instigated by Groves in his effort to stave off further controversy with the Hayward interests and St. George. Petitioner acceded to Groves' insistence since it did not appear to make any difference to him and might leave less controversy between the ICD shareholder groups. We are satisfied that in February 1976, no one anticipated that a $1 million tax liability would be asserted against petitioner based largely on these February Documents. On February 19, 1976, at the conclusion of the February confrontations, St. George did receive the Zodiac corporate file, [14] but as we have found no share certificate had been issued in the name of Zodiac. We are also satisfied that the share certificates in the name of Development Co. were not with the Zodiac papers or otherwise delivered to St. George. It is thus unlikely that the Development Co. certificates were among the corporate papers in the ICD headquarters. In any event bearer share certificates for the Development Co.-Zodiac corporation were never in petitioner's personal custody. If such shares were in fact at any time after petitioner became CEO constructively *401 in petitioner's possession, it would have been in his capacity as CEO of ICD and for the benefit of ICD. On February 19, 1976, petitioner executed two affidavits, one of which purports to exonerate the Groves and Rozak from any knowledge or responsibility for Zodiac and releases each of them from any liability. The second recites that an aggregate of $3,000,000 has been held in suspense and is in the account of Zodiac and that petitioner delivered all of the issued and outstanding shares of Zodiac to St. George and to de la Rue. Although the source and purpose of these two affidavits is not entirely clear, both are acknowledged by an attorney formerly in the law office of St. George in Freeport. They appear to be based, at best, on an incorrect understanding of the facts and on some generalized concerns of counsel. To the extent that these affidavits are inconsistent with the facts we have found, they, like the other items comprising the February Documents, must be ignored. Petitioner *402 at the request of St. George telephoned the Royal Bank to request a transfer of the funds in the Zodiac account to a special account set up by St. George for this purpose. The Royal Bank refused to act, however, until that request was confirmed in writing by an individual authorized to withdraw funds from the account. Either Rozak or Aston handled this function. The funds in the Zodiac account, amounting to slightly less than $3,000,000, were transferred to ICD's control. Thereafter, ICD accepted the transfer of petitioner's lease on the apartment in Freeport used as his residence to make up the deficit in the bank account so that ICD would recover the $3,000,000 demanded by St. George. Subsequent Events
At some point, presumably in 1974 when ICD became operational, its stock was listed on the New York Stock Exchange as a publicly-held company. As such it was subject to the rules and regulations of the SEC. At no point prior to February 1976 did the periodic filings with the SEC reflect the payment of political contributions, the use of false invoices to accumulate funds, and the build up of a slush fund in the Zodiac account. On the advice of counsel, ICD reported to the SEC *403 in 1976 or 1977 facts with respect to the accumulation of the slush fund in the Zodiac account, petitioner's participation therein, his termination as CEO, and the making of political contributions. An investigation was commenced by the SEC of questionable payments and other matters which ultimately led to court orders in 1978 enjoining ICD and petitioner from violating the law in the future. SEC employees were authorized to take testimony and a number of interrogations [15] took place in the United States and in the Bahamas. Many documents were examined by the SEC employees. However, no published report of the investigation was made or filed. On advice of his counsel, petitioner declined to cooperate with or be interrogated by the SEC examiner. In connection with termination of the SEC investigation, ICD created an audit committee (Audit Committee) which continued to investigate facts and trace funds in order to ascertain, among other items, whether or not any monies were actually misappropriated by petitioner and whether any bribes had been paid to petitioner. Petitioner refused to be interviewed by Roger C. Minahan, a United States attorney, who had assisted St. George in February *404 1976 and was appointed as Chairman of the Audit Committee. In addition, a stockholder's derivative action was filed on behalf of ICD and its shareholders in the name of Chris Pappas in the United States District Court for the Southern District of New York (77 CIV 6165 (RD)). A number of depositions were taken during the course of that law suit, but again petitioner declined to be deposed. That lawsuit ultimately was settled by payment of fees for the attorneys for Mr. Pappas, apparently following the purchase by the Haywards and St. George of sufficient shares of outstanding ICD stock for the company to be delisted by the New York Stock Exchange as a publicly-held corporation. The details of this suit are sketchy in this record and are immaterial to the issues before us except as they impact upon the *405 numerous documents sought to be introduced into the record by respondent over the hearsay and other objections of petitioner, which objections were disposed of in 86 T.C. No.    , (1986). Suffice it to say that no definitive findings of fact were made by the SEC, the Audit Committee, or in the Pappas proceeding. $178,000 Unreported Income
In the statutory notice respondent determined that petitioner received, in 1975, $119,000 from Devco and $59,000 from Freeport Commercial and Industrial Limited (FC&I), another subsidiary of Port, which monies petitioner failed to include in income. The $119,000 item from Devco is composed of $44,000 paid to St. George on May 30, 1975, in settlement of a fictitious invoice of like amount from Devco. By check dated June 3, 1975, St. George's office paid Castle $44,000, the funds being received by Castle on June 13, 1975. In addition, $75,000 was paid by ICD to Johnstone by check dated March 21, 1975. This sum was, thereafter, transferred by Johnstone to Castle by check. Ultimately, the $75,000 with other funds was transferred by Castle to Zodiac. The $59,000 is composed of $50,000 paid to St. George by FC&I by check dated May 16, 1975, which *406 funds were thereafter transferred by St. Georges' office to Castle by check on June 3, 1975. An additional $17,000 was paid to St. George by FC&I by check dated May 2, 1975. Of this sum $8,000 was paid by St. George in settlement of an unrelated claim and $9,000 was paid to petitioner in a form of a check payable to cash dated May 14, 1975. Petitioner used this $9,000 to pay expenses of ICD, incurred to acquire shares of Devco in small lots from unrelated shareholders. A portion of these funds deposited with Castle was used for political contributions, for various unrelated transactions, and the balance was transferred by Castle to Zodiac's account in the Royal Bank. None of the $178,000 which respondent determined was unreported income, was misappropriated by petitioner or used in any way for his personal benefit. ULTIMATE FINDINGS OF FACT Petitioner in his individual capacity never became the legal or beneficial owner or holder of the shares of Development Co.-Zodiac. During petitioner's tenure as CEO of Port and thereafter of ICD, petitioner did not misappropriate to his own use and benefit any funds of Port, ICD, or any of the subsidiaries of either corporation. To the extent *407 that petitioner exercised control over Zodiac and the funds deposited in and withdrawn from its Royal Bank bank account, petitioner was acting in his capacity as CEO of ICD and for the benefit of Port and, thereafter, ICD. OPINION Credibility of Witnesses
This is essentially a fact case and our findings of fact foretell the result. However, the parties, and especially respondent, are entitled an understanding of the basis for our factual conclusions. Petitioner's case rests almost entirely upon the credibility of his witnesses, i.e., petitioner himself and St. George. Respondent's case, on the other hand, depends largely upon the February Documents and upon hearsay statements to SEC investigators, to members of the Audit Committee and in depositions taken in the Pappas litigation, most of which we have excluded from evidence, in large measure, because of our conclusions as to their unreliability. Respondent also urges us to take note of the apparent violations of United States laws such as the failures to make required disclosures in SEC filings, especially as to the accumulation of the slush fund in Zodiac and the payments of political contributions as well as probable violations *408 of certain U.S. currency laws to which petitioner was a party. To the extent that petitioner was not currently aware that such violations were occurring, he was at least indirectly responsible in his capacity as CEO and, hence, captain of the ICD ship. Respondent fails to realize, however, that business standards in the Bahamas during the time period relevant to this case were not the same as in the post-Watergate era in the United States. Moreover, the disclosures during the post-Watergate era of similar malfeasance by executives of many United States corporations doing business abroad was not necessarily, or even frequently, accompanied by misappropriation of corporate funds by the executives concerned. Neither did the practice of paying foreign politicians for business necessarily imply that corporate executives were unreliable when testifying under oath. Generalizations cannot be made. Further there is no particular significance in this case in the fact that petitioner may have directed ICD business to a personal friend. [16] His participation in the use of false invoices in order to generate funds which could be used for political contributions in the Bahamas without disclosure *409 of that purpose on ICD's books is similarly beside the point. While by no means condoning the violations of United States laws and regulations by several of the executives of ICD, including petitioner, we do not consider these facts to have blackened the character of petitioner so as to make untrustworthy his testimony before us. During the trial we were fully aware of respondent's contentions and we have made our own judgments as to the credibility of the witnesses. We found petitioner to be sincere, forthright, and a thoroughly reliable witness. St. George is an English barrister of note, who has served his country's Government in a number of important capacities. He voluntarily came to Florida to testify in this case at some personal inconvenience to himself. There can be no doubt either as to his veracity or his motives. [17] Respondent characterizes the St. George SEC interrogation as more accurate than his testimony in this proceeding and it was, of course, closer in point of time *410 to the critical events, particularly those in January and February 1976. However, we find the inconsistencies between his testimony before the SEC and before us fully explained. We also find convincing St. George's own judgment of himself. He testified: I have no business interests, no business affiliations. My only reason for coming here is as I have said, that I think perhaps I judged him [petitioner] a little harshly initially, and I felt that I then had a moral duty to come and say what I really thought. Finally, we have the fact that Groves knew about the purchase by Zodiac of petitioner's Devco stock with ICD funds and then its resale to ICD. As the owner of approximately 35 percent of the ICD stock, it is inconceivable that Groves would have permitted this accumulation of ICD funds in Zodiac if that company was, in fact, owned and controlled by petitioner individually. On the other hand, with Mrs. Groves as the sole shareholder and the Groves, Rozak, and Aston as the only persons authorized to withdraw funds from the Zodiac bank account, it is fully understandable *411 that Groves would have concurred in these (as well as other) transactions involving Zodiac. As to the ultimate motives of Groves, we need not speculate. Comment is appropriate with respect to the procedure used by petitioner to accumulate the slush fund in Zodiac as it relates to respondent's view of his motivation. As we have found, many individuals associated with ICD knew petitioner was depositing large sums in Zodiac, including Groves, Rozak, Ms. Melrose, Johnstone, and probably Aston. D. C. de la Rue participated in the transfer of $2,000,000 to Zodiac. While petitioner probably could have caused funds to be withdrawn and delivered to him for unsupervised use, that would have required the cooperation of Groves, Mrs. Groves, Rozak, or after April 1975, Aston. Such indirect control of Zodiac funds is hardly consistent with an intention on the part of petitioner, allegedly conceived in 1973, of using Zodiac to store funds misappropriated by him, unless all signators on Zodiac account were co-conspirators with petitioner. Foreign Personal Holding Company Income Issue
The principal element in the 1975 deficiency in this case arises out of the treatment by respondent of Zodiac *412 as a foreign personal holding company solely owned by petitioner. Insofar as relevant, sections 551 and 552 provide as follows: SEC. 551(a) General Rule.--The undistributed foreign personal holding company income of a foreign personal holding company shall be included in the gross income of the citizens or residents of the United States, * * * who are shareholders is such foreign personal holding company * * * in the manner and to the extent set forth in this part. SEC. 552(a) General Rule.--for purposes of this subtitle, the term "foreign personal holding company" means any foreign corporation if-- * * * (2) Stock Ownership Requirement.--At any time during the taxable years more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals who are citizens or residents of the United States, hereinafter called "United States group". The rules for determining foreign personal holding company income under section 551 are somewhat complex and have been substantially ignored by the parties in this case. The statutory notice treats the $2,000,000 reported sale of Devco stock by Zodiac to ICD as a capital transaction, allowing *413 Zodiac a basis equivalent to its cost, the sum of $650,000 paid to petitioner. The gain of $1,350,000 plus the interest income earned by Zodiac is determined to constitute foreign personal holding company income taxable to petitioner in his individual 1975 calendar year. [18] The entire controversy with respect to the foreign personal holding company issue relates to whether or not petitioner was, in fact, the sole shareholder of Zodiac. [19]
In the determination of stock ownership for this purpose, we may look to the rules for determination of ownership in domestic personal holding companies under section 544. Section 1.552-3(a), Income Tax Regs. *414 In Estate of Miller v. Commissioner,43 T.C. 760, 766 (1965) we said "[w]e think there must actually be controlling U.S. shareholders of the foreign corporation before the foreign personal holding company statutes can have any effect." We must, therefore, determine whether or not petitioner was the controlling "U.S. shareholder." And in this context, the inquiry is whether or not petitioner was the controlling shareholder for his own account, and not as an agent or fiduciary for ICD. It is appropriate to recall at this point that Development Co. was a Panamanian corporation, the shares of which are described as "bearer" shares. Although the significance of that terminology would, we presume, be in the first instance a matter of Panamanian and/or Bahamian corporate law, neither party has discussed the applicable law. Instead the parties seem to have accepted the fact that bearer shares are simply transferable by delivery and the holder of a certificate of bearer shares is presumed to be the owner. In this respect the bearer shares appear to be somewhat similar to shares of United States corporations issued in street names. See 11 Fletcher, Cyclopedia of the Law of Private Corporations, *415 sec. 5091, p. 59 n. 18 (Perm. ed. 1978 rev.); 1 Christy, The Transfer of Stock, sec. 22, p. 3:1 and sec. 56, p. 7:15 (5th ed. 1975). It is undisputed that Development Co. was organized at the instance of Groves in 1969 and that the bearer shares were held, and thus owned, by one or the other of the two Groves. We are satisfied that the copies of the corporate minutes which have been received in evidence are copies of the genuine minutes and that they correctly reflect in material respects the facts relevant to this case, [20] *416 although with some obvious but unimportant errors. For example, at the May 31, 1973 meeting, the new name of the corporation is shown as Zodiac Shareholdings, Ltd., rather than Zodiac Shareholdings, Inc. The minutes of the Board meeting on the same day recite that Mrs. Groves contributed $150,000 for additional stock whereas, in fact, the funds came from ICD. There are two copies of minutes of the annual meeting on February 17, 1975, both signed, which differ in that one set omits reference to certificate No. 2 for 900 shares. Finally, the minutes of the last recorded shareholders' meeting held on April 15, 1975, uses the name Groves Development Co., Inc. rather than Zodiac Shareholdings, Inc. These inaccuracies reflect, we conclude, sloppy work on the part of Rozak and his available secretarial staff. They do not serve to case doubt on the basis representations contained in the minutes as to possession and ownership of the bearer shares. Respondent argues, as to the copies of the minutes, that they are inadmissible and further that after May 1973 only "nominee" meetings were held as a convenience to petitioner. We simply do not believe that Rozak would have prepared minutes reflecting Mrs. Groves as the shareholder or that she and Groves would have approved and *417 she would have signed minutes reflecting such fact, if, in fact, the shares had actually been transferred to petitioner. That the officers and directors might have continued to serve as a convenience to petitioner is at least possible; that Mrs. Groves would, for no reason, have allowed herself to be shown as the shareholder is beyond belief. The record fully supports our finding that through April 15, 1975, Mrs. Groves was treated as the holder of the bearer certificates. [21] *418 Whether between the two Groves, Mrs. Groves or Mr. Groves was the beneficial owner, we need not determine. We have also found that the Groves remained as Directors and the President and Vice President, respectively, through the date of petitioner's resignation as CEO of ICD. When Aston was substituted for Rozak as Corporate Secretary and Director on April 15, 1975, Mrs. Groves continued to be treated as the owner of the bearer shares. We are satisfied that the shares of the Development Co. stock were owned legally and beneficially by one or the other of the two Groves. Although the name of the company had been changed on the public registry of Panama from Groves Development Company, Inc. to Zodiac Shareholdings Inc. effective August 21, 1973, up to the time of petitioner's resignation from ICD in February 1976, there was no outstanding share certificate issued in the name of Zodiac to anyone. However, we decline to believe that the ownership of Zodiac was in a vacuum by reason of the absence of a certificate in its name evidencing its shares. In the absence of evidence as to Panamanian or Bahamian corporate law to the contrary, we have to be guided by general principles of corporate law. We thus assume that *419 the certificates No. 1 for 100 shares and 2 for 900 shares of Development Co. stock remained outstanding and continued to evidence the ownership of such numbers of shares (bearer or otherwise) in Zodiac. Ignoring the fact recitals in the February Documents as to possession, as we have concluded we should, we are left with no evidence as to the actual whereabouts of the bearer shares subsequent to the April 15, 1975 joint shareholder-directors meeting of Zodiac. Rozak in his Pappas deposition did his best to convey the impression that when he delivered the Development Co.-Zodiac corporate documents to petitioner (if in fact he did so), the bearer shares were contained therein. However, he was forced to state that he then (in July 1978) had no recollection of actually seeing the bearer shares in petitioner's position. That, of course, is consistent with the fact that Mrs. Groves had theretofore retained physical custody of them, as the minutes recite, all of which confirms petitioner's testimony that petitioner never received the share certificates. We conclude that petitioner never had personal custody of the Development Co.-Zodiac bearer certificates. [22] *420 We are further convinced that petitioner's only contact with Development Co. or Zodiac was in his capacity as CEO of ICD. Petitioner did effectively control the Zodiac bank account in the Royal Bank in the sense that as CEO of ICD he was able to cause funds to be deposited in and withdrawn from it. And this bank account appears to be the only business activity Zodiac carried on during this period. That brings us to the legal question of whether or not the connection which petitioner admittedly had with Zodiac as CEO, but without either personal possession or control of the bearer share certificates, is sufficient to cause him to be characterized in his individual capacity as the sole member of the "United States group" of shareholders. Turning to section 544, stock owned directly or indirectly by or for a corporation is treated as being owned proportionately by its shareholders. If the Development Co.-Zodiac bearer shares were in fact being *421 held by Groves or Mrs. Groves for the benefit of ICD, as we believe, or even by petitioner as CEO of ICD, petitioner as a minority shareholder of ICD, would be treated as a minority shareholder of Zodiac. Respondent does not and on the facts cannot argue that the 50-percent test is so met or that in this fashion 100 percent of Zodiac's 1975 income is taxable to petitioner. Were we to construe the facts, including inferences from inadmissible documents, most favorably to respondent, we can do no more than find that petitioner controlled Zodiac for the benefit of ICD. The funds in the Zodiac bank account were at all times intended to be used for ICD's benefit. Zodiac had no claim to such funds and the paper gain which respondent seeks to treat as income to petitioner arose out of a simulated transaction. Zodiac's only income in 1975 was its $35,000 interest income which also belonged to ICD since the invested funds belonged to ICD. The paper gain of $1,350,000 was ICD's not Zodiac's. But even if on some theory petitioner were estopped to deny that Zodiac realized this gain, it still would not be taxable to petitioner. With the February Documents entitled to little credence, petitioner's *422 credible testimony corroborated by St. George, by documents and by logical inferences, and nothing to the contrary except inadmissible, unreliable hearsay, we hold for petitioner on the foreign personal holding company issue. $178,000 Unreported Income Issue
Our fact findings are again sufficient to dispose of this issue. Petitioner did not use or appropriate for personal purposes any element of this sum of money. Therefore, we find for petitioner on this issue. By reason of the stipulated deficiency for the year 1977, An Appropriate order will be entered.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Although Mrs. Groves was an inactive participant in business affairs, it apparently was Groves' custom to cause her to hold title to securities. We conclude that, from a practical standpoint, beneficial ownership was in the Groves' family unit.
3. We assume that petitioner actually took office as CEO of Port which apparently continued to run the business until ICD became operational in 1974.↩
4. Although the making of political contributions by ICD in the Bahamas plays a major role in this case, neither petitioner nor respondent has supplied us with acceptable evidence that such contributions were, during the period involved, legal under Bahamian law. There are also at least inferences in the record that contributions to individual politicians as distinguished from those to political parties were, at best, somewhat delicate if not illegal. However, everyone involved in this case, the parties and the nonparty witnesses, have operated on the assumption that contributions to political parties in the Bahamas were legal and we accordingly accept that as a correct characterization of Bahamian law.↩
5. It is not our function to judge the propriety of this practice or its legality under United States standards, not withstanding the fact that ICD was listed on the New York Stock Exchange. As such, it was required to file reports with the Securities and Exchange Commission (SEC), many of which may have been false or misleading because the fact of the making of political contributions was not revealed.
6. Rozak acted as Groves' personal assistant for many years. He also served during this period as director and secretary of ICD. ↩
7. Counsel have not undertaken to discuss on brief the effect of the lack of further meetings. Presumably that did not alter the authority of the officers and directors to continue to act for and in Zodiac's name.
8. St. George testified consistently before us and in his SEC interrogation that he did not receive share certificates for Zodiac shares in February 1976 when he received other Zodiac corporate papers. Before us he explained that the problem was with counsel in Panama in connection with the corporate name change. Before the SEC he stated that the Development Co. certificate "had been handed back for reissue." Presumably action for reissuance of the certificate or certificates in the name of Zodiac should have been commenced in 1973 or shortly thereafter in connection with the name change handled by Rozak. Resolution of this fact issue would have been helpful but it is not critical to the case. We also note that neither party has seen fit to brief the question of ownership of a Panamanian corporation with bearer shares where the share certificate is in process of being reissued. Neither are we advised whether this corporation could then issue only bearer shares or whether that status depends on a legend on the certificate or otherwise. Thus, it is unclear whether after the effective date of the name change, Zodiac in fact had only bearer shares outstanding.
9. During a portion of this period, another Groves Panamanian corporation, Atlanta Bahamas Company, also with a bank account in the Royal Bank, was used as a depository for certain ICD funds, which ultimately were transferred to Zodiac. These facts are significant only insofar as they reflect Rozak's participation in Zodiac long after, according to his testimony, he ceased to have any knowledge of Zodiac's activities.↩
10. We are constrained to conclude that Rozak was fully aware of transactions such as this in spite of his denials during his SEC interrogation. We are also impressed with St. George's testimony that Johnstone would not have participated in the diversion of large amounts of ICD funds to Zodiac without the knowledge that Groves concurred in the plan. 11. Although there is no evidence on this point, we do not believe Groves would have permitted petitioner's Devco stock to be purchased by Development Co.-Zodiac with ICD funds without some logical reason. The obvious inference is that the plan to sell the stock to ICD, at an inflated price, was devised in 1973. Moreover, Groves certainly would not have permitted ICD to pay $10 per share to Zodiac for petitioner's former stock unless he had had some control over the ultimate disbursement of the $2,000,000.↩
12. It is unclear whether the matter was first discussed with Groves or petitioner, but that discrepancy is immaterial.↩
13. The copy of the handwritten note received in evidence is totally illegible. A typed document identical with the handwritten note except that the typed document shows as a signature the word "Gerry" before which appears the symbol "/s/" implying that this typed document is a copy of the handwritten note was also received as a stipulated exhibit. We accept petitioner's testimony that the typed version was presented to him with a request that he copy it in long hand, which he did. The critical fact is that the document was prepared at Groves' request and back dated in an effort to get Groves "off the hook" with the St. George-Hayward faction.↩
14. St. George testified that Rozak left the February 19, 1976, meeting, and returned with the Zodiac corporate file which he delivered to petitioner. Petitioner then delivered the file to St. George.↩
15. We have used the word "interrogation" for lack of a better description. Witnesses were sworn and were allowed to have counsel present but little or no interrogation was permitted by such counsel and none by other parties or their counsel. The proceeding was essentially one for fact finding but in several instances the SEC examiner urged witnesses to speculate, repeat hearsay, etc.↩
16. Respondent contends that ICD funds were diverted to Angela Howard, a friend of petitioner. At various times she did work for Port or ICD or one of the subsidiaries for which she received payments.↩
17. Minahan is a thoroughly credible witness although his testimony contributes little to the resolution of this case.↩
18. There is no evidence as to the accounting year of Zodiac, the patties apparently assuming that it was the calendar year, so that its entire income for the year 1975 would be includible in petitioner's 1975 income. ↩
19. Respondent on brief argues that Zodiac should have no basis in the Devco stock and therefore the gain on the sale of the stock in 1975 should be $2,000,000 rather than $1,350,000. Respondent's argument, made for the first time on brief, simply comes too late. Aero Rental v. Commissioner,64 T.C. 331, 338↩ (1975). It is also immaterial.
20. Respondent objected to receipt in evidence of the minutes, because among other grounds, the corporate secretary Rozak is alleged to have stated that actual meetings as reflected in the minutes were not held but that the minutes were simply passed around for signature. Respondent's counsel apparently does not realize that that is a common practice among corporate secretaries and corporate lawyers in closely held United States corporations and the practice does not invalidate the corporate action reflected in the minutes or cast doubt on recitals therein as to stock ownership.
21. In the copy of the Listing Application to the New York Stock Exchange, Inc. filed by ICD, dated December 28, 1973 (Exhibit GH), Mrs. Groves is shown as sole shareholder of Groves Securities Co., Inc. which held the Port shares and then Benquet shares owned by the Groves. She is also shown as indirectly owning Devco shares, apparently the shares purchased by Zodiac from petitioner. While the minutes of Development Co.-Zodiac can be interpreted to reflect that Rozak may have had actual custody of the shares, his testimony in the Pappas↩ litigation was very specific to the effect that Mrs. Groves personally brought the share certificate to the meetings. (See Exhibit 164, pp. 21-23).
22. If petitioner had possession of the Atlantic Bahamas bearer's certificate, it was constructively and for the benefit of ICD on the assumption that the Atlantic Bahamas corporate papers were delivered by Rozak to Aston as successor Corporate Secretary for Zodiac. See n. 9.